IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ADRAIN MONROE &
ANDRELL WHITE,
    *individually and for others*
    *similarly situated*,

    Plaintiffs,

v.        Civil Action No.  2:23-cv-692

STAKE CENTER LOCATING, LLC,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the Motion for Protective Order and Corrective Notice filed by Adrain Monroe and Andrell White ("Plaintiffs"). ECF No. 26. Plaintiffs' Motion relates to a communication sent by Defendant Stake Center Locating, LLC ("Stake Center") to its employees, who are also putative class members in this case. The communication introduced an optional bonus plan that is conditioned on employees' agreement to a class action waiver and binding arbitration of most employment-related claims against Stake Center. Plaintiffs argued that the communication was "improper" and "coerc[ive]," and asked the Court to issue a protective order and corrective notice modifying the bonus plan and imposing various requirements on Stake Center. *See* Mem. Supp. at 8–9, ECF No. 27. Following oral argument on the Motion, the Court granted the Motion and ordered Stake Center to issue a corrective notice to the employees who previously agreed to participate in the bonus plan. *See* Order, ECF No. 43. This Opinion sets forth the Court's reasoning.

## I.  BACKGROUND

In December 2023, Plaintiffs Adrain Monroe and Andrell White filed a Class Complaint against Stake Center, bringing claims under Virginia law for unpaid wages arising from their work as utility locators. Compl., ECF No. 1. The full factual and procedural background for the action is provided in the Court's Opinion on Plaintiffs' Motion to Certify Class. Mem. Op., ECF No. 52.

In July 2024, while the case was still pending, but before Plaintiffs filed a motion to certify the case as a class action, Stake Center announced the rollout of a "Locator Appreciation Bonus Plan" ("Bonus Plan"). *See* Pls.'s Ex. 1 ("Bonus Communication"),[1] ECF No. 27-1; Resp. at 1, ECF No. 29. The first page of the Bonus Communication sent to employee locators (the "announcement") described the terms of the Bonus Plan as "simple," explaining: "After 1,000 hours of work (which includes overtime hours), the Locator will earn a $1,000 bonus payment." Bonus Communication at 2. The announcement expressed that "Stake Center appreciates the work its locators do and is excited to provide this bonus as a way of thanking Locators for their hard work." *Id.* The announcement also noted that, while participation in the Bonus Plan was "completely voluntary," locators who participated would be subject to the Locator Appreciation Bonus Plan Participation Agreement ("Bonus Plan Agreement"), which would be sent to the employee locators in a separate document via DocuSign. *Id.*

---

[1] The exhibit attached to Plaintiffs' Memorandum in Support of their Motion for Protective Order and Corrective Notice includes three documents: a one-page announcement introducing the Bonus Plan, a one-page "Virginia-specific notice" that identifies the instant class action, and a seven-page "Locator Appreciation Bonus Plan Participation Agreement." *See* ECF No. 27-1; Resp. at 3, ECF No. 29 (describing "Virginia-specific notice"). The citations in this Opinion refer to the full exhibit as the "Bonus Communication" and employ the pagination assigned to that exhibit in CM/ECF. The Opinion also references the individual documents within the Bonus Communication, particularly the Locator Appreciation Bonus Plan Participation Agreement.

As the announcement outlined, the Bonus Plan Agreement required employee locators to agree, among other things, to arbitrate claims against Stake Center "arising out of [their] employment or the termination of employment" and to waive their right to participate in class litigation. Bonus Communication at 2–8. The Bonus Plan Agreement also included non-disclosure and non-solicitation provisions. Bonus Communication at 8–9. Locators were given twenty-one (21) days to sign the Bonus Plan Agreement. Bonus Communication at 2.

Also included in Stake Center's Bonus Communication was a "Virginia-specific notice" referencing the instant class action and describing the claim at issue as follows: "plaintiffs, former [Stake Center] Locators, allege that they were not paid for all hours worked and that their overtime rate was not calculated correctly." *Id.* at 3; *see* Resp. at 3. The notice then informed locators that "by signing the [Bonus Plan Agreement], you are waiving your ability to participate in the pending class action lawsuit outlined above and any other potential class action lawsuits brought against [Stake Center] in the future." Bonus Communication at 3.

Ultimately, twenty-two (22) putative class members signed the Bonus Plan Agreement, and the deadline to do so has passed. Tr. at 12:19–23, 13:12–17, ECF No. 44.[2] Plaintiffs moved for a Protective Order and Corrective Notice regarding Stake Center's communication with employees about the Bonus Plan. Mot. Protect. Order, ECF No. 26. Specifically, Plaintiffs asked the Court to (1) prohibit Stake Center from requiring that employees sign the arbitration agreement and class

---

[2] To be clear, the Bonus Plan was sent to employee locators company-wide. The twenty-two individuals referenced above are locators the parties have identified as putative class members in this case who are currently employed with Stake Center. The Court notes that there are additional class actions pending against Stake Center in other state and federal courts, and putative class members in those cases may have also received a similar communication. *See* Def.'s Ex. 1 ("McCullough Decl.") ¶ 5, ECF No. 29-1 (describing "company-wide" rollout); Mem. Supp. at 2 n.1 (listing class actions against Stake Center in other jurisdictions). Nevertheless, the Court's Order, ECF No. 43, applies only to communications made to the putative class in this case.

waiver in order to receive the $1,000 bonus; (2) prohibit Stake Center from enforcing any arbitration agreements already signed as part of the Bonus Plan Agreement; and (3) authorize Plaintiffs' counsel to send a proposed corrective notice. *Id.* Stake Center responded, Resp., and Plaintiffs replied, Reply, ECF No. 32. At a hearing on the Motion ("Motions Hearing"), the Court heard oral argument before granting the Motion in part. ECF No. 42. The Court ordered Plaintiffs and Stake Center to file proposed corrective notices, in line with the Court's ruling, after engaging in a meet-and-confer process. Order, ECF No. 43. Each of the parties then filed a proposed notice. Pls.'s Proposed Corrective Notice, ECF No. 45; Def.'s Proposed Corrective Notice, ECF No. 46. The Court subsequently granted in part Plaintiffs' Motion to Certify Class. Mot. Certify Class, ECF No. 30; Mem. Op., ECF No. 52; Order, ECF No. 53.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 23(d) gives district courts broad discretion to "impose conditions on the representative parties" or "deal with similar procedural matters" in conducting class litigation. Fed. R. Civ. P. 23(d)(1)(C), (d)(1)(E). This includes the authority to regulate attorneys' communications with class members and putative class members. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). The Court's discretion under Rule 23(d), however, is not unbounded. Any order limiting communications with potential class members must be based on a clear record and specific findings that reflect a weighing of: (1) the need for a limitation on communications; and (2) the potential interference with the rights of the parties. *Id.* at 101.

Courts generally consider a two-pronged test to determine whether a limitation on communication with potential class members is warranted. *See Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697–98 (S.D. Ala. 2003); *see also Ross v. Wolf Fire Prot., Inc.*, 799 F. Supp. 2d 518, 526 (D. Md. 2011) (applying the *Cox Nuclear* test); *Adair v. EQT Prod. Co.*,

4

No. 1:10-cv-37, 2011 WL 4501048, at *5 (W.D. Va. Sept. 28, 2011) (same). Under the first prong, the movant seeking the limitation "must show that a particular form of communication has occurred or is threatened to occur." *Cox Nuclear Med.*, 214 F.R.D. at 697. To satisfy the second prong, "the movant must show that the . . . communication at issue is abusive in that it threatens the proper functioning of the litigation." *Id.* at 697–98. Examples of communications that may be abusive and warrant judicial intervention include: "communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Id.* at 698.

If the Court determines, after weighing the relevant factors, that a limitation on communication is needed, the limitation must be drawn as narrowly as possible. *See Gulf Oil*, 452 U.S. at 102; *see also Lewis v. Bloomsburg Mills, Inc.*, 773 F.2d 561, 564 n.4 (4th Cir. 1985).[3]

### III.   ANALYSIS

In this case, Stake Center communicated with putative class members by sending its employee locators the announcement regarding the Bonus Plan, as well as the Virginia-specific

---

[3] Stake Center's communication with its employees is commercial speech which may be limited so long as the limitation is "grounded in good cause and issued with a heightened sensitivity for First Amendment [c]oncerns." *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003) (citing *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1203 (11th Cir. 1985)). The following criteria are relevant to the good cause inquiry: "the severity and likelihood of the perceived harm, the precision with which the order is drawn, the availability of a less onerous alternative, and the duration of the order." *Id.* Where, as here, the Court is remedying the effects of past communication rather than restricting future communications, First Amendment concerns are minimized. *See Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 254 (S.D.N.Y. 2020). To the extent the Court's Order implicates First Amendment concerns, the Court finds that the Order is precisely drawn to address a harm that has already occurred, and that there is no less onerous alternative that would correct the misleading effect of Stake Center's communication. An analysis of the "duration of the order" is inapplicable, given the retrospective nature of the relief. The Order is therefore justified by good cause and reflects a heightened sensitivity for Stake Center's First Amendment rights.

notice and the Bonus Plan Agreement. Tr. at 12:19–24, 13:12–15; *see* Def.'s Ex. 1 ("McCullough Decl.") ¶ 14, ECF No. 29-1 (stating that approximately 21% of putative class members received the Bonus Plan Agreement). As such, the first *Cox Nuclear* prong is satisfied. *Cox Nuclear Med.*, 214 F.R.D. at 697. The Court will therefore consider whether Stake Center's communication was "abusive in that it threaten[ed] the proper functioning of the litigation." *Id.* at 697–98. Finding that the communication was abusive, the Court next considers the question of appropriate relief under Rule 23(d). *Id.*

### A. Abusiveness of Communication

The second prong of the *Cox Nuclear* test considers whether the communication was abusive, coercive, deceptive, or created a potential for such concerns. *See Cox Nuclear*, 214 F.R.D. at 697 n.3 (noting that, under *Gulf Oil*, district courts consider the "*likelihood* of serious abuses" (quoting 452 U.S. at 104)); *see Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 255 n.31 (S.D.N.Y. 2020), *objections overruled*, 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021) (observing that "in cases applying Rule 23(d) and *Gulf Oil*, coercion and deception emerge as the leading forms of abuse"). In making this assessment, other courts have considered: (1) the "relative vulnerability" of putative class members; (2) evidence of actual or potential coercion; (3) "whether the defendant targeted putative class members in a purposeful effort to narrow the class"; and (4) "evidence of misleading conduct, language, or omissions, including the extent to which the agreement does or does not mention the existence of the putative class action and related information." *See Chen-Oster*, 449 F. Supp. 3d at 255, 263–64;[4] *see also Belt v. Emcare, Inc.*, 299

---

[4] The *Chen-Oster* court used these factors to analyze whether arbitration agreements entered into with putative class members were voidable, but considered that question under Rule 23(d) and *Gulf Oil*. The Court finds the same list of factors helpful in determining whether Stake Center's communication constituted actual or potential coercion, deception, or abuse. *See Chen-Oster*, 449 F. Supp. 3d at 254–255, 255 n.31; *see also* Resp. at 7.

F. Supp. 2d 664, 668–69 (E.D. Tex. 2003) (considering misleading language and intent to narrow the class); *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1379–80 (S.D. Ga. 2009) (considering the coercive effect of communication, given past and potential for future employment relationship between the parties).

In considering Stake Center's communication regarding the Bonus Plan, many of the clear indicators of abusiveness or coercion are absent. For example, the Virginia-specific notice sent by Stake Center clearly identifies the instant pending class action. Bonus Communication at 3. There is no evidence that locators were explicitly or implicitly threatened with losing their jobs if they did not sign the Bonus Plan Agreement. *Compare with Salazar v. Driver Provider Phoenix LLC*, 532 F. Supp. 3d 832, 837–38 (D. Ariz. 2021); *Randolph v. PowerComm Const., Inc.*, 41 F. Supp. 3d 461, 466 (D. Md. 2014). Employees were given three weeks to decide whether they wanted to participate in the Bonus Plan, not a handful of days. *Compare with Salazar*, 532 F. Supp. 3d at 387 (employees had two business days to return agreement).

Nevertheless, consideration of the specifics of this case, as well as the communication at issue, weigh in favor of a finding of abuse or potential for abuse. The Court must consider the relative vulnerability of the putative class members. *See Chen-Oster*, 449 F. Supp. 3d at 255. Here, the available evidence suggests Stake Center locators are economically vulnerable given their employment options and compensation. At the Motions Hearing, Stake Center's counsel confirmed that many Stake Center locators have no more than a high school education. Tr. at 15:4–17. Locators are hourly workers, not highly educated professionals. *Compare with Chen-Oster*, 449 F. Supp. 3d at 264 (considering "well-educated and well-compensated financial services professionals"). Stake Center paid Plaintiffs a regular hourly rate of approximately $19. *See* Paystubs, ECF No. 33-1 at 228–33. This compensation would result in an annual salary of

7

approximately $40,000 (assuming a 40-hour work week). While the Court finds that an employee-employer relationship alone is insufficient evidence of coercion, there is reason to think that the "disparity in bargaining power" between locators and Stake Center is exacerbated by the locators' relatively low pay and lack of business or financial expertise. *See Chen-Oster*, 449 F. Supp.3d at 265–66 (finding that "employment relationship alone" was not "enough to demonstrate sufficient potential for coercion"); *see also Camp v. Alexander*, 300 F.R.D. 617, 621 (N.D. Cal. 2014) ("Courts have also observed that an ongoing employer-employee relationship is particularly sensitive to coercion.").

Most critically, however, the Court finds that the communication regarding the Bonus Plan was misleading. Stake Center advertised the Bonus Plan as an "*Appreciation* Bonus Plan," and described it as a way to thank locators for their hard work. Bonus Communication at 2 (emphasis added). Locators are not, however, guaranteed a $1,000 bonus merely as appreciation for working 1,000 hours. They must also agree to mandatory arbitration for most claims arising out of their employment with Stake Center. Bonus Communication at 4–8. The Bonus Plan Agreement not only requires that locators give up their right to participate in this class action, but also in future class actions. Bonus Communication at 4–5. In short, the $1,000 bonus is conditioned on locators severely curtailing their ability to seek redress in court and as a class. Stake Center's framing of the Bonus Plan obfuscates the true import and consequences of signing the Bonus Plan Agreement.

The communication also presents other issues. While the Virginia-specific notice does identify this class action, it does not clearly describe the claims at issue in a way that the average person would understand. *See* Bonus Communication at 3; *Chen-Oster*, 449 F. Supp. 3d at 255 (considering "the extent to which the agreement does or does not mention the existence of the putative class action"). The notice states that the Plaintiffs in this action "allege that they were not

8

paid for all hours worked and that their overtime rate was not calculated correctly." Bonus Communication at 3. The Court finds that description too vague to meaningfully assist an individual with no legal training in evaluating the pending claims. The communication does not advise locators that they may want to speak to an attorney prior to signing.[5] *See* Bonus Communication; *see also Camp*, 300 F.R.D. at 625 (finding that defendants' letter regarding pending wage-and-hour suit was "one-sided," in part because it "fail[ed] to provide contact information for Plaintiffs' counsel"). Considered as a whole, the communication leaves locators with insufficient information and guidance regarding the significant rights they would relinquish by participating in the Bonus Plan.

Weighing the relative benefits of the bargain to Stake Center, on the one hand, and to locators, on the other, further highlights the potential for coercion. Assuming a forty-hour work week, 1,000 hours constitutes approximately 25 weeks (or six months) of work. The Bonus Plan increases locators' pay by $1 per hour for those 1,000 hours. In exchange for that modest increase, locators make substantial concessions through the arbitration agreement, class waiver, and non-solicitation and non-disclosure provisions. To put it bluntly, the Bonus Plan is not a very good deal for locators. That imbalance reinforces the Court's view that locators would benefit from additional

---

[5]   While the Court finds that putative class members may benefit from the advice of Plaintiffs' counsel in evaluating the Bonus Plan Agreement, the Court does not credit Plaintiffs' argument that the American Bar Association's ("ABA") Model Rules "prohibit" Stake Center from communicating with class members. Mem. Supp. at 3. The ABA has indicated that "a client-lawyer relationship with a potential member of a class does not begin until the class has been certified and the time for opting out by a potential member of the class has expired." *Ramadan v. Richmond Redevelopment & Hous. Auth.*, No. 3:19-cv-166, 2020 WL 259552, at *7 (E.D. Va. Jan. 17, 2020) (quoting *ABA Comm'n on Ethics & Prof. Resp.*, Formal Op. 07-445 (2007)) (cleaned up).

9

information and, potentially, the advice of counsel, prior to signing the Bonus Plan Agreement.[6]

### B. Remedial Action

Having found that Stake Center's communication was potentially coercive and, therefore, was "abusive in that it threatens the proper functioning of the litigation," the Court finds that some remedial action is warranted under Rule 23(d). *Cox Nuclear Med.*, 214 F.R.D. at 697–98; *see Chen-Oster*, 449 F. Supp. 3d at 264 (considering "actual or potential coercion"). The next question for the Court concerns the proper form and scope of judicial intervention. Any intervention must be "specifically confined to the narrowest limits required to meet the [identified] need." *Lewis*, 773 F.2d at 563 n.4.

Plaintiffs ask the Court to effectively modify the Bonus Plan by allowing locators to participate in the Bonus Plan without signing the arbitration agreement and class waiver. Mem. Supp. at 5–9. They also ask the Court to declare any arbitration agreement that has already been signed to be unenforceable. *Id.* The Court does not find it appropriate, or within the scope of its discretion, to modify the Bonus Plan by removing certain terms. Plaintiffs appear to suggest that Stake Center should be required to pay locators a bonus for working 1,000 hours, without any additional consideration. Mem. Supp. at 5. The Court declines to commit Stake Center to a bargain that would violate fundamental tenets of contract law. To do so would drastically overstep the Court's cabined authority to regulate communications under Rule 23(d). Nor will the Court

---

[6] The Court also notes that, while Stake Center was not required to receive approval from the Court prior to communicating with locators about this pending action, they nevertheless *could have* asked for permission. *See, e.g., A&R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07-cv-929, 2012 WL 3854954 (D. Conn. Sept. 5, 2012) (considering defendants' request to communicate with putative class members); *see also Degidio v. Crazy Horse Saloon & Rests. Inc.*, 880 F.3d 135, 144 (4th Cir. 2018) ("[D]istrict courts must be able to supervise contacts between the parties and their respective counsel to ensure that potential plaintiffs are not misled about the consequences of joining a class in an ongoing employment dispute.").

prohibit Stake Center from enforcing arbitration agreements that have already been signed. An inquiry into the enforceability of the Bonus Plan's arbitration agreement is premature and unwarranted at this stage in the litigation. Rule 23(d) authorizes the Court to regulate *communications*, and it is the effect of the communication regarding the arbitration agreement—not the arbitration agreement itself—that is before the Court on Plaintiffs' Motion.[7]

The Court will, however, require that any locators who have signed the Bonus Plan Agreement be given the opportunity to "claw-back" that Agreement. The twenty-two locators who signed the Agreement must therefore be sent a notice giving them the opportunity to withdraw their Agreement and providing them with contact information for Plaintiffs' Counsel. If, after receiving that information and additional context about this class action, those locators still wish to agree to the Bonus Plan, they may do so. Such a remedial measure targets only the particular communication at issue, and the rights of the particular individuals affected. It is therefore tailored to the particular "need for a limitation" and does not unduly "interfer[e] with the rights of the parties." *Gulf Oil*, 452 U.S. at 101.

## IV.   CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiffs' Motion for a Protective Order and Corrective Notice, ECF No. 26. The Court orders that Stake Center

---

[7] For the same reason, the Court does not credit Stake Center's argument that Plaintiffs "lack standing" to challenge the enforceability of the arbitration agreement included in the Bonus Plan. *See* Resp. at 4–5. At this stage of the litigation, the Court is concerned with the injurious effect of the communication regarding the Bonus Plan and has authority to regulate that communication under Rule 23(d). Stake Center does not cite, and the Court is not aware of, caselaw indicating that a plaintiff must have any "standing"—other than their role as a class representative—to seek judicial intervention under Rule 23(d). *See Salazar*, 532 F. Supp. 3d at 836–37 (finding that plaintiffs had suffered an injury where arbitration agreement was likely to "deter[] potential collective action members from opting into the action," even though defendants had not attempted to enforce the agreement).

provide the attached Corrective Notice to the twenty-two locators who have signed the Bonus Plan Agreement within seven (7) days of the entry date of this Opinion. As reflected in the Corrective Notice, Stake Center must then provide the locators with twenty-one (21) days to withdraw from the Agreement. Stake Center is further directed to file a status report with the Court on the results of the Corrective Notice no later than fourteen (14) days after the 21-day withdrawal period has passed.

/s/ _____
Elizabeth W. Hanes
United States District Judge

Norfolk, Virginia
Date: March 27, 2025